**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GHULAM ALI,** | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )　　　Civil Action No. 14-cv-1674 (TSC) |
| | ) |
| **GINA McCARTHY, Administrator, EPA** | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

Plaintiff Ghulam Ali alleges that the Environmental Protection Agency (the "Agency")

discriminated against him due to his race, gender, national origin, age and disability.  He also

alleges that the Agency retaliated against him.  Specifically, Ali claims that the Agency acted

with discriminatory and/or retaliatory motive when it: (1) failed to promote him to pay grade GS-

14; (2) transferred him throughout the Agency; and (3) refused to allow him to continue working

in a private office as an accommodation for his environmental allergies.  Finally, Ali asserts the

Agency created a hostile work environment.

Plaintiff, who is proceeding *pro se*, brings claims under Title VII, 42 U.S.C. § 2000e, the

Rehabilitation Act, 29 U.S.C. §§ 701 *et seq*, and the Age Discrimination in Employment Act, 29

U.S.C. §§ 621 *et seq*.[1]  The Defendant has moved for summary judgment on all counts.  Having

---

[1] Ali also purports to bring his disability discrimination claim under the Americans with
Disabilities Act (ADA).  That claim is not actionable, however, because Ali is an employee of
the federal government and, therefore, his workplace disability claims are governed by the
Rehabilitation Act.  *See* 29 U.S.C. §§ 701 *et seq*.; *see Barth v. Gelb*, 2 F.3d 1180, 1183 (D.C.
Cir. 1993).

reviewed the submissions of the parties and the record herein, and for the reasons set forth

below, the court will GRANT the Defendant's motion. [2]

# I.    LEGAL STANDARD

## A.  Motions for Summary Judgment

Summary judgment is appropriate where there is no genuine issue of material fact, and

the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 325 (1986).  In determining whether a genuine issue of material fact

exists, the court must view all facts in the light most favorable to the non-moving party.  *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party

bears the "initial responsibility of informing the district court of the basis for its motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits . . . which it believes demonstrate the absence of a

---

Ali cites to the Lily Ledbetter Fair Pay Act of 2009 (Pub. L. 111-2) in his Complaint.  To the extent he seeks to assert claims under this statute, his claims are not actionable because he does not appear to have alleged that he was paid less than similarly situated GS-13 persons outside of his protected groups.  Rather, he alleges discrimination as it relates to promotions and transfers.

Finally, Ali cites to 42 U.S.C. § 1981, which prohibits discrimination based on race in the formation of contracts.  However, he cannot proceed under Section 1981 because "Title VII provides the exclusive statutory remedy for an employee's racial discrimination claims against a federal government agency."  *Marcus v. Geithner*, 813 F. Supp. 2d 11, 19 (D.D.C. 2011) (citing *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 825 (1976)); *see Kizas v. Webster*, 707 F.2d 524, 541–43 (D.C. Cir. 1983).

[2] Ali did not respond to the Agency's Statement of Undisputed Facts (SOF).  Accordingly, the court can and will treat the assertions in the Agency's SOF as conceded.  *See* Local Civil Rule 7(h)(1) (In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.")

genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted).  The nonmoving party, in response, must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

### B.  *Pro Se* Litigants

It is well established that "[c]ourts must construe pro se filings liberally." *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999); *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (*pro se* pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers").  Despite this less stringent standard, "a *pro se* plaintiff's opposition to a motion for summary judgment, like any other, must consist of more than mere unsupported allegations and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial." *Prunte v. Universal Music Grp., Inc.*, 699 F. Supp. 2d 15, 21-22 (D.D.C. 2010) *aff'd*, 425 F. App'x 1 (D.C. Cir. 2011) (citing Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324).  As the non-moving party, the *pro se* plaintiff "is required to provide evidence that would permit a reasonable jury to find in his favor." *Prunte*, 699 F. Supp. 2d at 22 (internal quotations omitted) (citing *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987)).

## II. PROMOTION AND TRANSFER CLAIMS

### A.  Background

Ali is a male economist, who is over forty years old, Asian, and of Pakistani national origin.  He began working at the Agency in 1990.  In the late 1990s, he filed a lawsuit against the Agency alleging discrimination in promotions, but the complaint was dismissed as untimely. Since 1999 he has been employed at the GS-13 pay level.

During the relevant portions of his tenure, Ali was employed in the EPA's Office of Water (hereinafter "Water Section"). [3]  During most of his tenure in the Water Section, Ali had a private office because of his allergies to environmental irritants.  Around 2000, he worked in the Office of Wastewater Management.  The Director of that office, Michael B. Cook, wanted to promote Ali, but Ali admits that he did not meet the time-in-grade requirement for promotion to a GS-14 pay level.  Around this same time, the Agency transferred him to a different office within the Water Section, the Office of Science and Technology ("OST"), where he remained throughout the relevant portions of his employment.

Without consulting Ali, the Agency placed him in the OST's Engineering and Analysis Division ("EA Division") so that he could work on a task force that was developing regulations about cooling water intake structures.  Ali claims that as part of the transfer, Cook and the Director of Ali's new office agreed to promote Ali to a GS-14.   Ali also claims that his transfer

---

[3]  Within the Office of Water are smaller units that also use the term "office" in their titles.  To avoid confusion, the court will refer to the larger Office of Water as the "Water Section," and the court will use the term "office" to refer to the smaller units.  Within each office are various divisions.

to the task force was conditioned upon his ability to transfer out of the EA Division when the project ended.

Somewhere between 2003 and 2005, the EA Division began reorganizing and downsizing.  As a result of the reorganization, the Agency asked EA Division employees to identify the positions they would like to hold within the division, as well as identify any positions outside of the division they desired, post-downsizing.  Ali's first choice was to stay in the EA Division.  His second choice was to transfer to the Standards and Health Protection Division ("SHP Division"), on the condition that he obtain a promotion to a GS-14.  (Plaintiff's Ex. A3; Pls. SOF ¶ 5).

In 2005, as a result of the downsizing, the Agency transferred Ali to the SHP Division, but did not promote him.  (*See* Pls. Br. p. 10).  He claims that his transfer was discriminatory, because there were other economists who could have been selected, but were not.  At some point, Ali objected to the transfer and claims the Agency agreed that he could return to the EA Division if he did not like the new assignment.  Once transferred, Ali worked in at least two branches within the SHP Division.

Two years later, on April 18, 2007, Ali contacted an EEO counselor about purported discrimination associated with the alleged promotion and transfer promises, as well as his failed attempts to retain a private office for health reasons.  (Compl. p. 9).[4]  He complained that the Agency had retaliated against him for filing the lawsuit in the 1990s and that it had discriminated against him on the basis of race, gender, national origin, age and disability.  The crux of the

---

[4]  In both his Complaint and brief, Ali indicates the contact date was April 18, 2007.  (*See* Compl. p. 9; Pls. Br. p. 27).  But curiously, in his Statement of Undisputed Facts he claims—without citation to the record—that he contacted the EEO counselor in March 2007.  (Pls. SOF ¶ 11).  This discrepancy does not change the outcome of this litigation, however.

disability claim, which the court will analyze in the second portion of this opinion, is that he needs a private office as an accommodation for his environmental allergies.  After a building renovation and space reallocation among various divisions, the Agency relocated Ali to a cubicle.  He contends that the Agency should have allowed him to stay in the private office but, as discussed below, he refused to submit specific medical information requested by the Agency and, therefore, abandoned the process for seeking an accommodation.

With respect to his promotion and transfer claims, Ali asserts that the Agency has continuously discriminated against him by intentionally reassigning him to different offices and divisions, so that he never was able to establish himself.   He claims the involuntary transfers contributed to his inability to obtain a promotion and asserts that, with each transfer, he was disadvantaged because he had to learn new program requirements and prove himself to new supervisors, who generally favor existing staff when making promotions.

Ali also contends that his current assignment in the SHP Division has been particularly detrimental, since he is the only economist in his division and, therefore, in a dead-end job.  He claims that the lack of other economists in his division negatively impacts his promotion potential, apparently because the absence of other economists means there is no need for team leader positions.  He further claims that, after the reorganization, the EA Division hired new economists—apparently younger than Ali—one of whom is a GS-14.  This, he argues, is evidence that his prior division needed economists and his inability to return to that division has derailed his attempts to move up to a GS-14.

Ali alleges that the Agency's actions in transferring him were discriminatory because the Agency allegedly did not involuntarily transfer economists who are outside of his protected classes.  Moreover, he claims the Agency discriminated against him when it (1) failed to honor

its alleged promises with respect to transfers and refused to allow him to transfer to a position of his choosing after the task force completed its project, and (2) failed to allow him to return to the EA Division upon deciding he was dissatisfied with the SHP Division.  Finally, Ali alleges that the Agency reneged on its promise to promote him and, instead, the Agency has awarded promotions in a discriminatory fashion.

### B.  Analysis

Federal law prohibits discrimination in employment based on age, 29 U.S.C. § 623, race, color, religion, sex, national origin, 42 U.S.C. § 2000e-2, and disability, 29 U.S.C. §§ 701. Federal law also prohibits employers from retaliating against employees who engage in protected activity, such as contacting an EEO counselor or filing a discrimination lawsuit.  *See* 29 U.S.C. § 623(d); 42 U.S.C. § 2000e-3(a).[5]  In order to bring federal employment discrimination and retaliation claims, a federal employee generally must "initiate contact" with an EEO counselor "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  *Noisette v. Geithner*, 693 F. Supp. 2d 60, 66 (D.D.C. 2010) (citing 29 C.F.R. § 1614.105(a)(1)).  Failure to meet the 45-day deadline constitutes a failure to exhaust, and "will ordinarily bar a plaintiff from pursuing a judicial remedy."  *Foster v. Gonzales*, 516 F. Supp. 2d 17, 22 (D.D.C. 2007).  "The initial burden of establishing a plaintiff's failure to exhaust administrative remedies rests with the defendant."  *Id.*

---

[5]   Although the Rehabilitation Act does not have a specific retaliation provision, it incorporates the remedies applicable under the Americans with Disabilities Act, including 42 U.S.C. § 12203(a), which makes it unlawful to retaliate against individuals for making a charge, testifying, assisting, or participating in an investigation, proceeding or hearing regarding charges of disability discrimination.  29 U.S.C. § 794a.

The Agency argues that Ali's promotion and transfer claims are barred because the conduct that he challenges occurred years before his contact with an EEO counselor.  The Agency contends that Ali was aware of his non-promotion around 2000, shortly after his transfer to the task force.  Because he did not contact an EEO counselor until April 2007, the Agency argues Ali failed to exhaust his promotion claim in a timely fashion.  It argues that Ali's transfer claims are likewise untimely because they arose in 2000 and 2005, years before Ali's contact with an EEO counselor in April 2007.

Ali advances two arguments in response to the Agency's timeliness challenge.  First, he argues that his claims are viable under the continuing violation doctrine.  Specifically, Ali alleges that his timely filing of the disability discrimination claim in 2007 makes his promotion and transfer claims actionable because the discrimination has been ongoing and continuous.  He makes the same argument with respect to his claim for a hostile work environment.

Second, he argues that his claims were timely because there was no discrete act that would have trigged his awareness of any possible discrimination during those many years, and he only became aware of the discrimination with respect to promotions and transfers around the time the Agency withdrew approval for his private office in 2007.

### 1. Continuing Violation

Under the continuing violation doctrine, "if the alleged acts constitute one similar pattern or practice and at least one illegal act took place within the filing period, then the complaint of discrimination is not time-barred and acts outside the statutory period may be considered for purposes of liability."  *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 368 (D.C. Cir. 2007) (citation and internal quotations omitted).

The doctrine does not save Ali's promotion and transfer claims, however.  In *Railway Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), the Supreme Court "foreclosed the use of the 'continuing violation' doctrine to restore an untimely claim involving a separate act of discrimination 'such as termination, <u>failure to promote,</u> <u>denial of transfer,</u> or refusal to hire.'" *Shea v. Rice*, 409 F.3d 448, 451 (D.C. Cir. 2005), *abrogated on other grounds by Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007) (emphasis added).  The Court explained that a termination or failure to promote constitutes a <u>discrete</u> retaliatory or discriminatory act which "occur[s] on the day that it happened."  *Morgan*, 536 U.S. at 110 (citations and internal quotations omitted) (emphasis added).  Consequently, a party must file a charge within 45 days thereafter, "or lose the ability to recover for it."  *Id*.  In other words, if a party does not file a charge within 45 days after a "discrete" act, the party cannot recover for that act, even if it is "related to" challenged conduct alleged in a timely charge.  *See id.* at 113.  Thus, Ali cannot avail himself of the continuing violation doctrine under the facts alleged here in order to salvage his failure to promote or transfer claims.

 Unlike claims involving discrete acts, "[h]ostile environment claims . . . cannot be said to occur on any particular day."  *Id*. at 115 (citations and internal quotations omitted).  Rather, hostile environment claims are

> comprised of a series of separate acts that collectively constitute one unlawful employment practice, and accordingly are subject to a different limitations rule. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011) (citing *Singletary v. District of Columbia*, 351 F.3d 519, 526 (D.C. Cir. 2003) (internal quotations and some citations omitted).

However, while a hostile work environment claim is not invalid simply because it consists of some discrete acts of discrimination, a claimant "may not combine discrete acts to form a hostile work environment claim without meeting the required hostile work environment standard." *Brooks v. Grundmann*, 748 F.3d 1273, 1278 (D.C. Cir. 2014) (citations, alterations and internal quotations omitted).  In order to show a hostile work environment, a plaintiff must present evidence that his "workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Morgan*, 536 U.S. at 116 (citations and internal quotations omitted).

Ali fails to meet this standard.  He argues that the Agency created a hostile environment by repeatedly promoting others, transferring him, and failing to honor promises that he could transfer on his own terms.  He also alleges he was "subjected to ridicule because [he] was forced to work from home (i.e., colleagues said that [he] was 'touring a foreign country' or that [he] was 'on vacation.'").  (Compl. p. 8).  Nothing about these allegations even suggests that his workplace was "permeated with discriminatory intimidation, ridicule, and insult" that was of such a degree that it altered his working conditions and created an abusive work environment. *See Morgan*, 536 U.S. at 116.

The court therefore finds that there is no genuine, disputed issue of material fact that would permit a jury to find that Ali was or is a victim of a hostile work environment, and he cannot rely on the continuing violation doctrine to save his untimely promotion and transfer claims.

**2. Discovery of the Alleged Discrimination**

Ali's second response to the Agency's timeliness argument is that he was unaware of the

discrimination until the Agency relocated him from a private office to a cubicle.  Without

providing any specific factual support, Ali asserts that

> [t]he health issue convinced me that I have been continuously victimized by
> discrimination based on age, race, sex, national origin, and retaliation and my
> physical handicapping condition, and that my personal and professional welfare
> does not matter to management at all.
>
> I was not in a position to know about the underlying discrimination motives/tactics
> beforehand.  The advent of the health issue was the first time I realized that I am
> being victimized by unlawful discrimination.
>
> I believe that management was using tactics to keep me from filing the complaint
> earlier.

(Compl. pp. 8, 12).  Ali does not explain how his "health issue" revealed to him that he had been

discriminated against on the basis of "age, race, sex, national origin, and retaliation," nor what

"tactics" he believes the Agency used to "keep" him from filing a complaint.  But, under the

most generous reading of his Complaint, the court presumes that he claims that the Agency never

intended to promote or transfer him and it was only when he was relocated to a cubicle in 2007

did he realize the Agency's promises had been a ruse.

Despite the 45–day filing restriction for federal employment discrimination claimants,

federal regulations provide that the agency shall extend the 45–day time limit if a plaintiff can

show:

(1) she was "not notified of the time limits and was not otherwise aware of them";

(2) she "did not know and reasonably should not have . . . known that the
discriminatory matter or personnel action occurred";

(3) "despite due diligence [she was] prevented by circumstances beyond [her] control
from contacting the counselor within the time limits; or

(4) "other reasons considered sufficient by the agency or the Commission."

29 C.F.R. § 1614.105 (a)(2).

Although he did not specifically cite to the federal regulations, Ali's argument appears to rely on criterion number two.  Courts in this jurisdiction have explained when a plaintiff's obligation to report discrimination begins:

> "The plaintiff's time for contacting an EEO counselor starts to run when the plaintiff has a reasonable suspicion that she has been the victim of discrimination." *Johnson v. Gonzales*, 479 F. Supp. 2d 55, 59 (D.D.C. 2007) (citing *McCants v. Glickman*, 180 F. Supp. 2d 35, 40 (D.D.C. 2001)).  A plaintiff is not allowed to "wait until she has direct proof of the allegedly discriminatory actions; rather, a plaintiff must contact an EEO counselor even if she is not in possession of the 'supportive facts' necessary to prosecute a discrimination charge." *Id.* (quoting *Paredes v. Nagle*, Civil Action No. 81–1374 (TAF), 1982 WL 319, at *4 (D.D.C. 1982)).

*Hines v. Bair*, 594 F. Supp. 2d 17, 22–23 (D.D.C. 2009) (alterations omitted).  "The determination of when a claim accrues is an objective inquiry turning on "not what the plaintiff actually knew but what a reasonable person should have known." *Mitchell v. MG Indus., Inc.*, 822 F. Supp. 2d 490, 495 (E.D. Pa. 2011) (citation omitted).

### a) Promotion claim

The court need not reach the issue of whether Ali's claim was timely.[6]  In response to the Agency's timeliness argument, Ali asserts in his brief that he "had not applied for a position of higher grade for promotion for which [he] was denied an opportunity.  Nor . . .was [he] a candidate for within grade promotion for which there is always a date."  (Pls. Br. p. 2).

---

[6] Were the court to reach the timeliness issue, the result would be the same, since Ali's promotion claim would be untimely for the same reasons that the transfer claim is untimely.

Given this admission, Ali cannot establish a *prima facie* case for discrimination.  In order to make out a claim for discriminatory non-promotion, Ali must show that: "(1) he is a member of a protected class; (2) <u>he applied for and was qualified for an available position</u>; (3) despite his qualifications he was rejected; and (4) either someone filled the position or the position remained vacant and the employer continued to seek applicants."  *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003) (citations omitted) (emphasis added).  Because Ali admits he never applied for a position, Ali cannot meet this test.

### b) <u>Transfer</u>

Ali's transfer claim fails because he has not alleged any facts or offered any evidence that he did not know or reasonably should not have known of the alleged discrimination years before contacting an EEO counselor.   In an email Ali proffers in opposition to the Agency's motion, he claims that management agreed to reassign him to the division of his choice once the task force project ended.  (Pls. Ex. A2).  According to Ali, the task force ended at or around the time Ali transferred to the SHP Division in 2005.  (*See* Compl. pp. 5, 12; Pls. Ex. A2).  Thus, as early as 2005, Ali was aware that the Agency had reneged on its promise to allow him his choice of transfers once the task force project was completed.  Moreover, Ali alleges that around this same time, he became aware that the Agency retained some economists in the EA Division, but transferred him to the SHP Division against his wishes, (Pls. SOF ¶ 5; Pls. Br. p. 10), and after he was transferred, the EA Division hired younger Caucasian economists rather than transfer him back.  (Pls. Br. p. 7; Compl. p. 10).  Despite this, Ali continued working in the SPH Division approximately two more years before contacting an EEO counselor.

Given these facts, as alleged by Ali, a reasonable person certainly would have been alert to potential discrimination within his agency, particularly someone like Ali who had previously filed a discrimination lawsuit against the Agency.  Moreover, given that Ali's prior lawsuit had been dismissed for untimeliness, a reasonable employee in his shoes would have been aware of the need for filing discrimination claims in a timely fashion.  Because Ali nonetheless failed to take action when he should have had a reasonable suspicion of discrimination, his claims are untimely and the court will grant the Agency's motion for summary judgment as to Ali's transfer claims.

In response to the Agency's timeliness argument, Ali has failed to present a genuine dispute as to any material fact.  He admits he did not apply for a promotion and, therefore, he failed to make out a *prima facie* case on that claim.  As for his transfer claim, he failed to timely exhaust his administrative remedies.  Accordingly, the court will grant the Agency's summary judgment on both claims.

### III. DISABILITY DISCRIMINATION CLAIMS

**A.  Background**

Ali suffers from "multiple allergies due to exposure to environmental allergens." (Compl. p. 6).  He claims that his medical condition can cause, *inter alia*, itchy skin, rashes, swelling of the eyes, face and arms, as well as difficulty breathing, seeing, walking, and sleeping. (Compl. p. 7; Defs. Ex. 1 pp. 14-15, 8/9/7 Addendum to EEO Charge).

Because of his medical condition, the Agency has provided Ali with a private office since at least 1997.  (Pls. SOF ¶ 1).  Even after he transferred to the task force in the EA Division around 2000, Ali's then-supervisor on the task force recognized that Ali had a "documented"

"medical problem" and assigned him a private office in accordance with the Agency's Alternative Work Space Program.  (Pls. Ex. C1).

The Alternative Work Space application form states that the program is available to an "employee who requests to work at a location other than the officially assigned work station solely because of claims of adverse health effects caused or aggravated by some condition associated with the officially assigned work site."  (Pls. Ex. D1).  According to an Agency supervisor,

> [t]he AWS program evolved out of the [Southwest Washington, D.C.] Waterside Mall (WSM) sick building situation and was designed to address the fact that a number of Agency employees could not work in the WSM complex because of the contaminated and compressed air in that facility.  Essentially, the Agency's AWS program is focused on work space that is hazardous.

 (Defs. Ex. 4, Keehner 4/6/09 Decl. ¶ 18).

Despite approving Ali's request for a private office under the AWS, Ali's supervisor warned Ali in a letter that the decision would be revisited "if [his] medical needs change, or when the [EA] Division moves to the new work space."  (Pls. Ex. C2) (emphasis added). Sometime later, the EA Division relocated from the Waterside Mall building to an office located on Pennsylvania Avenue.  (Defs. Ex. 2 p. 2).  As a result of the move, the Agency allocated the EA Division less desirable workspace than other divisions and, to compensate, gave the division additional private offices.  (*Id*. pp. 2-3).  Apparently, these additional offices—and not the AWS Program—made it possible for Ali to retain his private office; he admits that his office in the EA Division, "was assigned to me on the basis of seniority . . . . . Thus, I did not need to apply for an alternative work place anymore."  (Compl. p. 6; Pls. Ex. D1).

As discussed above in section II. A, in early 2005, after the reorganization and downsizing of the EA Division, the Agency involuntarily transferred Ali to the SHP Division.  It

is undisputed that in the new division, non-supervisory employees at the GS-13 level do not occupy private offices.  (Defs. SOF ¶¶ 32–33; Defs. Ex. 1, p. 54, Ali 11/16/07 Aff.).  Despite this policy, Ali was initially able to keep his private office, which was located in the space allocated to his prior division.  (Defs. Ex. 1, p. 66–67, Keehner 12/4/7 Aff.).  According to Ali's second line supervisor, SHP Division Director Denise Keehner, there was no urgent need for Ali to vacate his office because the larger Water Section was involved in a major office renovation and space redistribution.  (Defs. Ex. 1 p. 67, Keehner 12/4/7 Aff.).  Accordingly, she and the Director of Ali's prior division agreed to allow Ali to remain in his private office, even though he no longer worked in that division.  (Defs. Ex. 4, Keehner 4/6/09 Aff. ¶¶ 2-3).

Around March 2005, anticipating the loss of the office upon completion of the renovations, Ali requested a private office as a reasonable accommodation for his allergies.  (Defs. SOF ¶ 18).  Ali does not explain what transpired immediately after his request, but Keehner was not aware that Ali took any further action to process his request, despite repeated inquiries from the Reasonable Accommodations Coordinator, Bill Haig.  (*Id.* ¶ 19).  Accordingly, the matter was ultimately closed.  (*Id.*)

More than a year later, as the office renovations proceeded, Ali renewed his request.  (Defs. Ex. 4, Keehner 4/6/09 Aff. ¶ 8; Defs. SOF ¶ 20).  On or about July 6, 2006, Ali and his then immediate supervisor, John Wathen, met with Haig about the private office request.  (Pls. SOF ¶ 7–8).  Around this same time, Ali submitted two medical documents to Haig.  (Defs. SOF ¶ 22).  The first was close to six years old: an October 2, 2000 letter from Dr. Suresh K. Gupta, an internist, in which she explained that Ali

> has persistently been suffering from eye irritation . . . [and] has breathing problem[s] as well . . . . [His] condition is not a sporadic allergic reaction to a single pollutant.  He is continuously being affected by environmental stressors.  He has developed an acute sense of smell that makes it difficult for him to breathe in the

presence of allergens.  It is not practical for Ali to share [an] office because [of] allergic attack[s]. . . . Once again, I recommend that Mr. Ali should be provided a separate office (a room) otherwise his health will deteriorate.

(Defs. Ex. 7; Defs. SOF ¶ 22).

Ali also gave Haig a prescription written by Dr. Michael Kaliner, an allergist, on June 21, 2006.  Dr. Kaliner noted that Ali was sensitive to environmental irritants and temperature changes.  Accordingly, Dr. Kaliner opined that Ali "would do best in an area where he can control smells and temperature.  Please provide him with such an area – a private room would work best."  (Defs. Ex. 8; Defs. SOF ¶ 22).

On the day Ali met with Haig and Wathen, July 6, 2006, Haig placed a note in his files memorializing the meeting.  (Defs. Ex. 6).  In that note, Haig indicated that they had discussed the Rehabilitation Act process again and noted that Ali had provided physician's notes from 2000[7] that were insufficient to establish "pwd."[8]  (*Id.*)  Haig also indicated in the note that Ali had designated Haig's office to receive and review any medical information.  Therefore, Haig intended to draft a determination letter "outlining specific information needed from [Ali's] health care provider."  (*Id.*)  Haig also indicated that Ali and his supervisor "may" pursue the private office request under the AWS.  (*Id.*)

Ali has a slightly different recollection of the meeting.  He recalls that Haig actually <u>recommended</u> AWS as a means for retaining the private office.  (Pls. SOF ¶ 7).  The court will assume this assertion to be true for purposes of summary judgment.  In any event, on the same day that he met with Haig, Ali submitted a formal request to a SHP Division upper level

---

[7] Although Haig's note indicates that both medical documents were dated 2000, the Defendant admits that one document was dated 2000 and the other was dated 2006.  (Defs. SOF ¶ 22).

[8] The court assumes this acronym stands for "person with a disability."

manager, requesting approval of a private office through the AWS.  (Pls. Ex. D1).  In an attached

memorandum, Ali noted that he had "recently gotten the doctors note to expedite the process";

presumably, Ali was referring to the July 2006 prescription that he had given Haig.  (*Id.*)

The following day, Haig sent an email to Ali and attached a "Determination of Disability

Letter," which informed Ali that there was "insufficient documentary evidence in either of the

two [physician] reports that would indicate that [your] ability to breath is substantially limited"

under the relevant Rehabilitation Act provisions, Agency guidelines and EEOC guidelines.

(Defs. Ex. 9).  Despite the deficiency in the information, Haig explained that his "no disability"

determination could be reconsidered if the Agency obtained the following "limited medical"

information from Ali's health care provider:

- "To what extent is this individual's ability to breathe affected by his medical condition, both on and off the job?"

- "Is/Are any other major life activity/activities, other than breathing, affected by his medical condition?  If so, what are they and to what extent are these major life activities affected, both on and off the job?"

- "How long has [sic] any limitations been imposed as a result of this medical condition? (*e.g.*, one month, six months, or please indicate other)."

- "Based on medical testing, what specific allergens/chemicals must Mr. Ali avoid being exposed to?"

- "What effect does/do currently used mitigating measures (e.g., medication, therapy, other), if any, have on the relative degree to which any of his major activities are affected?"

- "Considering the limitations imposed by his medical condition what reasonable accommodation(s) might you suggest that will allow Mr. Ali the best opportunity to perform his essential job duties? (Please provide your doctor with a copy of your position description or a list of essential job duties as outlined by management)."

(Defs. Ex. 9). [9]

Haig instructed Ali to give a copy of the Determination of Disability Letter to his health care provider and return the requested information within approximately twenty-five days.  (*Id.*) Accompanying the letter was an "Authorization to Release Medical Records and/or Information" form that would allow Ali's health care providers to disclose the requested information to Haig. (*Id*).  Haig concluded the Determination of Disability Letter by noting that, even though Ali had not been determined to be an individual with a disability at that point, "management has the authority to provide the necessary resources that allow employees the best opportunity to perform their jobs in a satisfactory manner."  (*Id.*)

Two months after Haig sent Ali the Determination of Disability Letter, Haig sent an email reminding Ali that he needed to submit additional medical information in order to complete the accommodations process, but that none had been received.  (Defs. Ex. 10).  Haig asked whether Ali wanted to "continue with the reasonable accommodation process and if any additional medical information [wa]s forthcoming."  (Defs. Ex. 10).

Approximately forty-five days later, having received no response from Ali, Haig sent a third email reminding Ali that his accommodation request remained pending, but that Haig had still not received the requested medical information.  (*Id.*)  Haig told Ali that he should let Haig know if there were any questions.  (*Id.*)  Several hours later, Ali responded to the email:

> Bill, my request is being considered by my office under the alternative process; my request in the past was approved under this process.  So, I would have to wait to see the conclusion of this process, before I could follow your process.

---

[9]   Ali attempts to discount the importance of Haig's disability determination, arguing that he is not a medical doctor and, therefore, not qualified to assess medical documentation provided in support of a request for accommodation under the Rehabilitation Act.  (Pls. Br. p. 26).  This argument is unpersuasive because the Rehabilitation Act does not require employers to hire or retain physicians to evaluate medical documentation.

Thanks for the update and the patience.

(Defs. Ex. 11).

Ali does not explain precisely how the Agency responded to his AWS application, except to say that he provided the Agency with additional medical information the following month, in November 2006. (Pls. Br. pp. 23, 15). He does not explain what specific information he provided to the Agency at that time and, to confuse matters even more, he cites to five physician letters in support of his assertion. (*See* Pls. Br. p. 23)(citing Pls. Exs. B1, B2, B3, B4, B5). By process of elimination,[10] it appears what he submitted in November 2006 was an undated letter from Dr. Gupta, in which she mentions medical testing performed years earlier, in 2000, and "suggests" that the Agency provide Ali with a private office because he is "suspectable [sic] to allergies" and "very sensitive to cold temperatures and pollution." (Pls. Ex. B1). Ali does not indicate to whom he sent this letter.

Approximately one month later, on December 1, 2006, Wathen sent an email to Keehner, explaining that Haig had recommended that Ali try to obtain a private office under the AWS:

> I have consulted with Bill Haig, the RA coordinator for HQ, and he has directed me towards AWS as the appropriate policy in the situation we now face. Neither is the individual concerned considered handicapped by [Rehabilitation Act] standards, nor does he wish to pursue that as a means of meeting his requirements. In this case the AWS sought by the individual is a private office, which would address both temperature/comfort issues and sensitivity to environmental factors, which I believe include personal care products. Limited but adequate (according to Bill Haig) medical document of this need has been provided.

---

[10]  Ali has placed in the record a total of five physician's documents. (*See* Pls. Exs. B1, B2, B3, B4, B5). At the meeting with Haig in July 2006 he submitted the 2000 letter from Dr. Gupta and the June 21, 2006 prescription from Dr. Kaliner. (Defs. SOF ¶ 22; Pls. Ex. B2, B5). In addition to the two from Dr. Gupta and Dr. Kaliner referenced above, (Pls. Exs. B2, B5), sometime after he relocated to a cubicle in March 2007, he submitted two more physician's documents to the Agency. (Pls. Br. p. 16) (citing Pls. Exs. B3–B4). Since the only document unaccounted for is Exhibit B1, an undated letter from Dr. Gupta, the court assumes that, this must have been the one Ali submitted in November 2006.

(Pls. Ex. D2) (emphasis added).

In the letter, Wathen further explained that the AWS emanated from an agreement

between the EPA and its unions and that the programs were distinct:

> An important distinction between the [Rehabilitation Act] and <u>AWS is that for the</u>
> <u>latter, if means of meeting the individual's requirement are not available it does not</u>
> <u>have to be met</u>.  In this regard, Suzanne has been good enough to counsel with the
> other divisions and has communicated to me the fact that a private office . . . is not
> available in [the OST]. This is the result that I have communicated orally to the
> individual.  An aspect of the AWS agreement that makes me uncomfortable with
> stopping the process at this point, however, is the fact that we may need to reach
> out more broadly within the complex to determine if space is available external to
> that controlled by [OST] in order to conform to the terms of the agreement . . .

> When the employee is assigned to AWS, the supervisor must determine where the
> employee will be assigned to work.  Available options include a different work
> station in the same building, a work station in another EPA or GSA building, an
> AWS space provided by the Agency, or a location other than an EPA building.

> [The Agency's facilities office] can provide information on the availability of
> alternative work space within the Headquarters buildings, can provide transition
> space, can alter existing space to address specific needs, where feasible, or can
> provide specified facilities services that may be requested for employees assigned
> to AWS.  To the extent possible, [the facilities office] can also take steps to improve
> the officially assigned work station in response to specific recommendations.

(Pls. Ex. D2)(emphasis added).  Wathen concluded by noting that he believed it

"appropriate to be thorough in adhering to the [AWS] agreement, both in terms of trying

to meet what I can only infer is a legitimate requirement and in terms of avoiding

complications down the road." (*Id*.)  Ali does not explain how the Agency responded to

Wathen's letter regarding Ali's AWS request.

Several months later, the renovation project ended and the Agency allocated space for the

EA Division (where Ali's office was located) and for the SHP Division (in which Ali actually

worked).  The head of the EA Division subsequently informed Ali's division head that the EA

Division could no longer allow Ali to occupy one of its private offices because they were

committed to EA Division employees.  (Defs. Ex. 4, Keehner 4/16/9 Decl. ¶ 11).  Thus, Ali was

scheduled to move to office space allocated to the SHP Division.  Because non-supervisory

employees in that division did not occupy private offices, the Agency informed Ali that he would

have to select space in a cubicle, but that the Agency could override the decision to place him in

a cubicle if he qualified for the AWS program.  (Defs. Ex. 5, Washington 4/14/09 Decl. ¶ 9;

Defs. Ex. 4, Keehner 4/6/09 Decl. ¶¶ 9, 11-12).

During the course of the move, the Agency allowed Ali to choose between two cubicles:

one cubicle in an "enclosed room," that was approximately 550 square feet and contained three

other cubicles, the other choice was a cubicle located in an "open office" setting.  (Defs. Ex. 1 p.

63, Wathen 11/29/16 Aff.; Defs. Ex 1 p. 89, Air Quality Test Report).  Ali choose the latter.

(*Id.*)

At some point, after complaining of adverse symptoms, Ali relocated to the cubicle in the

"enclosed room."  (*See* Defs. Ex. 4, Keehner 4/16/9 Decl. ¶¶ 13-14).  On or around March 19,

2007, Ali "showed [his] disease symptoms" to one of his supervisors, who suggested that Ali

visit the Agency's medical office, where he was instructed to go to the emergency room.

(Compl. p. 7).

After that medical incident and after one of his officemates complained about the air

quality in the room, the Agency conducted an air quality test of Ali's cubicle, and compared it

with the air quality in the private office he had previously occupied.  (*See* Defs. Ex. 1, pp. 86-

99).  During the air quality test and interviews, which occurred around April and May 2007, the

Agency allowed Ali and the other employees in the shared office to work elsewhere and, at some

point, allowed Ali to work at home.  (Defs. SOF ¶ 42).

Ali claims that, around this time, the Agency asked him to provide additional medical information and he did, producing two letters written by Dr. Asha Vali, who is Board Certified in family medicine.  (Pls. Br. p. 16) (citing Pls. Exs. B3–B4).  In an undated letter, Dr. Vali opined, relying on her clinical examination and an evaluation by an asthma specialist, that "[d]espite medical treatment," Ali's "multiple allergies" were "persistent and recurrent due to continuous exposure to environmental allergens" and "extreme temperature changes."  (Pls. Ex. B4).  Accordingly, Dr. Vali recommended that Ali "limit his exposure to these allergens by being in an isolated office environment (private room)." (*Id.*)

In the other letter, dated April 13, 2007, Dr. Vali explained that she had been treating Ali for allergic reactions that were "persistent and recurrent, possibly due to continued exposure to environmental allergens."  (Pls. Ex. B3).  Therefore, "[i]t may be advisable for him to limit his exposure to these allergens by being in an isolated office environment."  (*Id.*)  She concluded by advising Ali's supervisor to contact her if there were further questions. (*Id.*)

Ali does not identify to whom he submitted the letters, but he claims that despite their submission, the Agency still failed to give him a private office.  (Pls. Br. p. 16). Less than one week later, on April 18, 2007,  Ali contacted the EEO counselor about alleged discrimination with respect to the private office and the previously discussed promotion and transfer complaints.  (Pls. Br. p. 27).

Several months later, on July 2, 2007, the air quality test report was issued.  The report revealed "no evidence . . . suggesting that the [indoor air quality] in Mr. Ali's private office was materially better than" the "enclosed" cubicle office.  (Defs. Ex. 1 p. 99, Air Quality Test).

The report also noted that a suggestion had been made, during the course of testing, that Ali

consult with a Federal Occupational Health "physician experienced in evaluating health

complaints attributed to indoor air quality and that, in conjunction with the consultation," Ali's

physician letters could be reviewed and the physicians contacted for additional information.  (*Id.*

p. 91).  According to the report, Ali's then supervisor Wathen indicated that Ali did not want to

pursue this route and would not sign an authorization of release of information.  (*Id*. p. 67; SOF ¶

40).

      After the air quality report was issued, one of the SHP Division supervisors sent Ali an

email confirming the results of the air quality test.  (Defs. Ex. 1 p. 121).   She advised Ali that, in

light of the air quality test results, he could no longer work from home and had to return to a

cubicle, but that the Agency expected to make a decision shortly on his AWS request.  (*Id*.)  It

appears that Ali returned to a different cubicle around November or December of 2007.  (*See* Pls.

SOF ¶¶ 14–15; Defs. Ex. 2, EEOC Decision at 4).

      Ali does not provide any information about what happened next, except to allege that

four years later, in 2012, he had an allergic reaction allegedly caused by his exposure to irritants

in the cubicle, and the Agency asked him to reapply for a reasonable accommodation.  (Pls. SOF

¶¶ 15–17; *see* Defs. Reply at 5).  He claims the Agency subsequently approved his application

"due to allergic reactions to volatile organic compounds such a perfumes, scents, etc." but that

the Agency still failed to provide him with a private office.   (Pls. SOF ¶ 15).  In his brief,

however, he clarifies that this lawsuit relates to the Agency's conduct before and up to March

2007, when he first moved to the cubicle, and not after.  (Pls. Br. p. 22).

**B. Analysis**

In a disparate treatment case where there is no direct evidence of discrimination, such as this one, the court applies the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). "Under that framework, ordinarily, the court first determines if the employee established a *prima facie* case." *Johnson v. Interstate Mgmt. Co., LLC*, No. CV 11–1702 (DAR), 2014 WL 4669810, at *3 (D.D.C. Sept. 19, 2014). To establish a *prima facie* case for disparate treatment "a plaintiff must establish that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the adverse employment action gives rise to an inference of discrimination." *Ginger v. District of Columbia*, 477 F. Supp. 2d 41, 48 (D.D.C. 2007) *aff'd*, 527 F.3d 1340 (D.C. Cir. 2008) (citation omitted).

This Circuit, however, "has 'simplified' the inquiry where the employer proffers a legitimate, non-retaliatory reason for the" challenged conduct. *Johnson*, 2014 WL 4669810, at * 3. If the employer "proffers legitimate, nondiscriminatory or nonretaliatory reasons for the challenged actions, the court need not conduct the threshold inquiry into whether the plaintiff established a prima facie case of discrimination or retaliation." *Morales v. Gotbaum*, No. 10–0221, 2014 WL 2031244, at *4 (D.D.C. May 19, 2014) (footnote omitted). Instead, "'the central question' then becomes 'whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted . . . reason [for the challenged employment action] was not the actual reason and that the employer intentionally [discriminated] against the employee." *Johnson*, 2014 WL 4669810, at * 3 (citations omitted).

Even in the absence of a disparate treatment claim, an employee with a disability may still have a claim for failure to accommodate under the Rehabilitation Act. That act requires that federal employers make "reasonable accommodation to the known physical or mental limitations

of an applicant or employee who is a qualified individual with handicaps, unless the agency can

demonstrate that the accommodation would impose an undue hardship on the operations of its

program." *Carr v. Reno*, 23 F.3d 525, 528–29 (D.C. Cir. 1994) (quoting 29 C.F.R. §

1614.203(c)(1)).  As explained in the Rehabilitation Act regulations:

> To determine the appropriate reasonable accommodation it may be necessary
> for the [agency] to initiate an informal, interactive process with the individual
> with a disability in need of the accommodation. This process should identify the
> precise limitations resulting from the disability and potential reasonable
> accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3) (cited in *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014)) (some

citations omitted).

The Agency argues that Ali does not have a viable reasonable accommodation claim

because he abandoned the interactive process by failing to provide sufficient medical

documentation of his purported disability.  The Agency also argues that it had a legitimate non-

discriminatory reason for relocating Ali to a cubicle, and that there is no evidence of pretext.

Specifically, the Agency points out that: (1) it is undisputed that non-supervisor SHP Division

employees like Ali did not occupy private offices; (2) Ali failed to provide medical

documentation that working in a cubicle, rather than a closed office, caused or exacerbated his

condition; and (3) air quality testing showed no difference in the air quality between Ali's private

office and his cubicle.

In response, Ali contends that the request for additional information was a pretext for

discrimination because the fact that the Agency approved him for a private office under the AWS

establishes that he met the requirements for accommodation under the Rehabilitation Act.  Ali

also contends that the Agency failed to act in good faith during the interactive process because it

ignored his physicians' recommendations.  He also faults the Agency for failing to contact Dr.

Vali, who indicated that the Agency could contact her for further information about his medical condition.  Finally, Ali appears to argue that the request for additional medical information was retaliatory because, in his view, the Agency did not seek such information until after Ali sought EEO counseling.

### 1.  AWS versus Rehabilitation Act

The court first considers Ali's argument that the Agency's request for additional medical information was a pretext for discrimination because the Agency's approval of his request for an accommodation under the AWS established that he met the qualifications for accommodation under the Rehabilitation Act.  According to Ali, "different terminology for the process does not make any difference."  (Pls. Br. p. 16).  He contends that the only true distinction between the AWS and the Rehabilitation Act is that, under the AWS, the employee's "supervisor is given the authority to provide an accommodation," rather than officials higher up the chain of command. (Pls. Br. p. 11).

Ali has not presented any evidence from which a reasonable fact finder could determine that his qualification for a private office under the AWS established that he was qualified for an accommodation under the Rehabilitation Act.  First, the AWS application indicates that the program is available to employees who suffer "adverse health effects caused or aggravated by" working at certain work locations.  (Pls. Ex. D1).  The application does not mention or cite to the Rehabilitation Act, and it is logical that an employee might suffer "adverse health effects" from exposure to building contaminants, but not necessarily qualify as a person with a disability under the Rehabilitation Act.

Ignoring this logical distinction, Ali points to three documents in support of his argument: (1) an EEOC opinion; (2) statements attributed to Haig; and (3) Wathen's email discussing Ali's AWS request.  None of these items swing the pendulum in his favor, however.

Ali claims that the EEOC "makes no distinction between" the AWS "and the reasonable accommodation process to fulfill the [Rehabilitation Act] requirement."  (Pls. Br. p. 12).  In support of this assertion, he cites an EEOC opinion that involved claims by EPA employees with multiple chemical sensitivities.  The opinion provides in relevant part:

> The agency states that in 1989, it initiated a health and safety program that provided an AWS program to its employees who alleged that they were sensitive to chemicals present in its offices. The agency indicates that this 1989 AWS policy was thereafter criticized by the United States General Accounting Office, and, thus, its management and its two headquarters unions negotiated a partnership agreement and issued the new AWS policy, which applied to all of its employees, *i.e.,* those participating in the AWS program as a reasonable accommodation, as well as those who were participating for other reasons.

*Spiegel v. EPA*, 01A03590, 2000 WL 33544012, at * 1 (EEOC Oct. 13, 2000) (emphasis added).

Ali's reliance on *Spiegel v. EPA* is misplaced.  The language above, upon which he relies, indicates there are at least two groups of employees who are allowed to take advantage of the AWS, those seeking reasonable accommodation—presumably under the Rehabilitation Act— and those who are participating "for other reasons."  *See id.*  While it is unclear what criteria the Agency uses to differentiate between these two groups, the cited language does not, as Ali asserts, stand for the proposition that qualification for AWS means an employee is also qualified to obtain reasonable accommodation under the Rehabilitation Act.

Next, Ali points to statements attributed to Haig as support for the proposition that the policies are the same.  According to Ali, Haig stated:

> As mentioned we have two sets of procedures those for AFGE bargaining unit members and procedures for all other EPA employees.  Diane informed me that Mr. Ali is a member of NTEU (National Treasury Employment Union) bargaining

unit and would be covered by those procedures for all other employees.  This will change the process a little [as] we discussed on the phone.

(Pls. Br. P. 14).

As initial matter, Ali does not provide a citation to the record that would substantiate his claim that Haig made the statement, so the court cannot consider the alleged statement as evidence in the case.  However, even assuming that Haig had made the statement and it was in the record, Ali's reliance on it is misplaced.  Haig simply mentions two procedures, but it is unclear what those procedures are, and the statement does not even hint that the AWS and Rehabilitation Act qualifications are the same.

Next, Ali points to the July 6, 2006 note that Haig placed in the file after he met with Ali and Wathen.  (Defs. Ex. 6).  In that note, Haig explained that he was going to prepare a disability determination letter outlining the specific information needed from Ali's healthcare provider.  Haig further explained that Ali "may also pursue this request under the Alternative Workspace Agency Policy."  (*Id.*)

Again, there is nothing in the note that suggests the two polices are the same and, indeed, the letter implies that the AWS is a separate and distinct option from the Rehabilitation Act process.  If the two policies were the same, then the medical documentation that was insufficient for Rehabilitation Act purposes would also have been deficient under the AWS and it would have been futile for Ali to apply under the AWS.[11]

---

[11]   In his brief, Ali argues that the documents Haig authored in 2006 are irrelevant because they do not relate to the Agency's denial of his request for accommodation in March 2007.  (*See* Pls. Br. pp. 22, 27).  This argument is unpersuasive.  Haig's request for additional information coupled with Ali's response that he was not going to proceed with "[Haig's] process" explains why, even through March 2007, the Agency had not provided Ali with a private office as an accommodation under the Rehabilitation act.  Moreover, Ali cannot have it both ways.  He cannot argue, on the one hand, that Haig's documents are irrelevant, but at the same time rely on those documents to support his argument.

Finally, Ali contends that Wathen's December 1, 2006 email establishes that the AWS and Rehabilitation Act requirements were the same.  The email in question was written several months after Haig requested additional information from Ali, who later decided he was going to pursue his request under the AWS.  In the letter, Wathen wrote:

> I have consulted with William Haig, the RA (reasonable accommodation) coordinator for HQ (headquarters), and he has directed me to towards AWS as the appropriate policy in the situation we now face. . . .

 (Pls. Ex. D2).

Again, this letter does not support the proposition that the AWS and Rehabilitation Act standards are the same.  Indeed, it appears that the situation the parties "now" faced was Ali's failure to provide the information requested by Haig and, therefore, a different procedure— namely the AWS—was necessary.  More importantly, in relying on this letter, Ali conveniently ignores the portions of the letter that undermine his position.  Specifically, in the letter Wathen writes:

> I have consulted with William Haig, the RA coordinator for HQ, and he has directed me to towards AWS as the appropriate policy in the situation <u>we now face</u>. <u>Neither is the individual concerned considered handicapped by [Rehabilitation Act] standards, nor does he wish to pursue that as a means of meeting his requirements</u>. In this case the <u>AWS sought</u> by the individual is a private office . . . .  Limited but adequate (according to Bill Haig) medical document of this need has been provided.
>
> An important distinction between the [Rehabilitation Act] and <u>AWS is that for the latter, if means of meeting the individual's requirement are not available it does not have to be met</u>.

(Pls. Ex. D2) (emphasis added).

The letter, when read in its entirety, actually discredits Ali's argument.  First, there is no indication in the record that Ali objected to or contradicted Wathen's statement that Ali was not "handicapped by [Rehabilitation Act] standards" or <u>that Ali did not wish to pursue the Rehabilitation Act as a means of obtaining his private office</u>.  (*See id*.) (emphasis added).

Second, the email notes that Ali does not qualify for accommodation under the Rehabilitation

Act, but instead appears to qualify under the AWS, thereby making a clear distinction between

qualifications for the two programs.

Having considered Ali's arguments, the court finds that there is no evidence in the

record to support Ali's assertion that his qualification for accommodation under the AWS

establishes that he was entitled to accommodation under the Rehabilitation Act.  Therefore, Ali

has not presented any evidence of pretext in the Agency's denial of his request for a private

office under one program, but not the other.


### 2.  Rehabilitation Act Interactive Process

The Rehabilitation Act provides for an interactive process that is "a flexible give-and-

take" between employer and employee.  *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014).

> "Neither party should be able to cause a breakdown in the process for the purpose
> of either avoiding or inflicting liability." *Sears*, 417 F.3d at 805 (quotation marks
> omitted).  Thus, "courts should look for signs of failure to participate in good faith
> or failure by one of the parties to make reasonable efforts to help the other party
> determine what specific accommodations are necessary.  A party that obstructs or
> delays the interactive process is not acting in good faith.  A party that fails to
> communicate, by way of initiation or response, may also be acting in bad faith."
> *Id*. . . .   For instance, "when the parties are missing information that can only be
> provided by one of the parties, the party withholding the information may be found
> to have obstructed the process. *Jackson v. City of Chi.*, 414 F.3d 806, 813 (7th Cir.
> 2005) (quotation marks omitted); *accord Stewart*, 589 F.3d at 1308–09. In sum, to
> establish that her request was "denied," [a plaintiff] must show either that the
> [employer] in fact ended the interactive process or that it participated in the process
> in bad faith.

*Id.* at 33 (some alterations omitted)(emphasis added).

The goal underlying the interactive process is for both parties to reach agreement on the

appropriate reasonable accommodation and, to the extent necessary, for the employer to

determine whether the employee does indeed have a qualifying disability under the

Rehabilitation Act.  "Merely having an impairment does not make one disabled for purposes of the [Rehabilitation Act]."  *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 195 (2002).  Rather, to be considered disabled under the Act, a plaintiff must establish that he has "a physical or mental impairment which substantially limits one or more . . . major life activities."  29 U.S.C. § 705(20)(B); *see Adams v. Rice*, 531 F.3d 936, 943 (D.C. Cir. 2008). [12]

"The Act nowhere defines the phrase 'major life activity,' but the Supreme Court has explained that the word 'major' denotes comparative importance and suggests that the touchstone for determining an activity's inclusion under the statutory rubric is its significance." *Adams v. Rice*, 531 F.3d 936, 943–44 (D.C. Cir. 2008) (citing *Bragdon v. Abbott*, 524 U.S. 624, 638 (1998); *Toyota*, 534 U.S. at 197 ("'Major' in the phrase 'major life activities' means important.")) (alterations and some internal quotation marks omitted).

To establish that she is entitled to the protections of the Rehabilitation Act,

[a]n individual seeking accommodation need not provide medical evidence of her condition in every case: An employee confined to a wheelchair would hardly need a doctor's report to show that she needed help in getting to her workstation if this were accessible only by climbing a steep staircase.  But when the need for an accommodation is not obvious, an employer, before providing a reasonable accommodation, may require that the individual with a disability provide documentation of the need for accommodation.

*Ward v. McDonald*, 762 F.3d 24, 31 (D.C. Cir. 2014) (alterations and quotations omitted) (emphasis added).

Ali argues that the Agency failed to participate in good faith during the "interactive process" because the Agency: (1) ignored the recommendations of his physicians; and (2)

---

[12]  The statute also provides relief for persons who have "a record of such an impairment" or who are "regarded as having such an impairment." 29 U.S.C. § 705(20)(B); *see Adams v. Rice*, 531 F.3d 936, 943 (D.C. Cir. 2008).  Ali does not argue that he falls into either of these two categories.

requested unnecessary additional medical information, while at the same time failing to reach out to one of his physicians who indicated the Agency could contact her for further information. These arguments are unpersuasive.  The court finds that the Agency's request for additional information was reasonable, despite the recommendations of Ali's physicians.  Further, the Agency acted reasonably by declining to contact Ali's health care providers directly because he did not sign the authorization to release medical information.  It is undisputed that Ali not only failed to complete the forms the Agency requested, but that he also failed to submit the additional medical documentation the Agency asked for during the interactive process.  Thus, despite his protestations to the contrary, the record indicates that it was Ali—not the Agency— who was responsible for the breakdown in the interactive process.

Even though Ali's physicians recommended a private office, they did not provide sufficient information from which the Agency could determine that Ali was a qualified individual with a disability and that a private office accommodation was necessary.  One of the physician's letters Ali gave Haig at their July 2006 meeting was almost six years old.  (*See* Ex. B2).  A plaintiff's "failure to provide updated medical information when reasonably requested is fatal to his failure to accommodate claim."  *See Gard v. U.S. Dep't of Educ.*, No. 11–5020, 2011 WL 2148585, at *1 (D.C. Cir. May 25, 2011)(citations omitted); *Carroll v. England*, 321 F. Supp. 2d 58, 69–70 (D.D.C. 2004) (granting summary judgment where plaintiff failed to provide updated medical documentation).  Not only was Haig's reluctance to rely on the six-year old physician's letter reasonable, but the letter itself indicated Ali's allergies were not caused by a "single pollutant," and the physician noted that Ali's "acute sense of smell made it difficult for him to breathe in the presence of allergens."  (Pls. B.2).  Nothing in the letter indicated that Ali's condition "substantially limit[ed] one or more . . . major life activities."  *See* 29 U.S.C. §

705(20)(B).  Neither did the letter explain why a private office, located in the same building as the cubicle, would protect him from the environmental irritants to which he was allergic.[13]

The second document Ali provided to Haig during the meeting—the prescription from Dr. Kaliner—was more recent, but equally uninformative.  The prescription indicated Ali was "sensitive to environmental irritants … plus temperature sensitivity, and that he would "do best in an area where he could control smells & temperature.  Please provide him with such an area = a private room would work best."  (Defs. Ex. 8; Defs. SOF ¶ 22).

The prescription, which is very general and contains a tepid recommendation, similarly does not establish that Ali was substantially limited in a major life activity or that working in a private office was crucial.  It was therefore reasonable for Haig to ask: "Based on medical testing, what specific allergens/chemicals must Mr. Ali avoid being exposed to?"  (*See* Defs. Ex. 9).  Likewise, it was reasonable for Haig to inquire about the "extent to which [Ali's] breathing [was] affected by his medical condition, both on and off the job."  (*Id.*)  "An employee seeking an accommodation for a disability must comply with an employer's reasonable request for medical documentation."  *Gard v. U.S. Dep't of Educ.*, 691 F. Supp. 2d 93, 100 (D.D.C. 2010), *aff'd*, No. 11–5020, 2011 WL 2148585 (D.C. Cir. May 25, 2011); U.S. Equal Emp. Opportunity Comm'n, Policy Guidance on Executive Order 13164: Establishing Procedures to

---

[13] In his brief, Ali asserts that "[a] single occupancy room was effective in the protection of my health because it isolated me from the exposure to colleagues' perfumes, scents, air fresheners, etc. and other violate organize compounds such as personal care products used by others in the cubicle space . . . ."  (Pls. Br. p. 8).  While this information would explain his desire for a cubicle, there is no evidence that his health care providers supplied this specific information to Haig or, more importantly, that his health care providers explained to Haig that exposure to fragrances had a debilitating impact on Ali.  (*See, e.g.*, Pls. Ex. B2 ("He has developed an acute sense of smell which makes it difficult for him to breath in the presence of allergens."); Pls. Ex. B5 ("He would do best in an area where he can control smells  . . . .")).

Facilitate the Provision of Reasonable Accommodation, 2000 WL 33407185, at *10 (Oct. 20, 2000).

Despite the reasonableness of Haig's inquiries, it is undisputed that Ali failed to provide the requested information.  Moreover, he refused to sign an authorization to release his medical information to the Agency—even after it was suggested that a federal occupational physician could consult with his health care providers to resolve the problem. (Defs. Ex. 1 p. 99, Air Quality Test).  Without such a medical release, the Agency had no authority to obtain information from Ali's doctors, even though one provider had invited the Agency to contact her.  Given these roadblocks that Ali erected, he cannot blame the Agency for the breakdown in the interactive process.  *See Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135–37 (7th Cir. 1996) (finding that the plaintiff did not act in good faith when she, *inter alia*, failed to provide requested information and failed sign a release so that the employer could obtain information needed to evaluate her request for reasonable accommodation).

Ali claims that he was not required to provide the information Haig sought because employers are barred from requesting additional information for an "existing long-term disability."  (Pls. Br. pp 14–15).  He relies again on *Spiegel v. EPA* to support his argument:

> The employer, however, cannot ask again for documentation that the employee has an ADA disability where the medical information the employee provided in support of his first reasonable accommodation request established the existence of a long-term impairment that substantially limits a major life activity.

*Spiegel*, 2000 WL 33544012, at * 2 (citing U.S. Equal Emp. Opportunity Comm'n, Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disability Act (ADA), EEOC Notice No. 915.002 at p. 23 (July 26, 2000)).

Again, Ali's reliance on *Spiegel* is misplaced.  The guidelines discussed in *Spiegel* prohibit an employer from requesting additional documentation when: "(1) both the disability and the need for reasonable accommodation are obvious, or (2) the individual has already provided the employer with sufficient information to substantiate that s/he has an ADA disability and needs the reasonable accommodation requested."  U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the American With Disabilities Act*, Requesting Reasonable Accommodation Question 8 (Oct. 17, 200); *see Enforcement Guidance on Disability-Related Inquiries*, EEOC Notice No. 915.002 at pp. 23–24, n. 54 (citation omitted).  This situation is inapplicable here.  First, Ali's allergies were not static in nature and could have been caused or exacerbated by environmental factors, both inside and outside the work place.  Thus, the need for an accommodation was not obvious.  Second, Ali had not "already provided the employer with sufficient information to substantiate that [he] has an ADA disability and needs the reasonable accommodation requested."  *Enforcement Guidance: Reasonable Accommodation*: Requesting Reasonable Accommodation Question 8.

Ali argues that he later provided three additional physician's letters which were sufficient to satisfy the requirements of the Rehabilitation Act.  This argument is unavailing for several reasons.  First, before he submitted the additional letters, Ali notified the Agency that he was <u>not</u> going to proceed with "[Haig's] process," but instead intended to proceed through the AWS.  (Defs. Ex. 11).  Moreover, Wathen confirmed in his email regarding AWS options, that Ali had decided to forego utilizing the Reasonable Accommodation process and instead, had opted to use the AWS process.  (Pls. Ex. D2).  The record is clear that Ali voluntarily abandoned the interactive process.

Second, even if this court were to consider Ali's submission of the three additional physician letters as a renewed request to proceed under the Rehabilitation Act, his reasonable accommodations claim still fails because none of the letters provided the information Haig had requested.  The first letter Ali gave the Agency, after withdrawing his reasonable accommodations request, was an undated letter that referenced a medical test performed over six years ago, in 2000.  (Pls. Ex. B1).  Thus, it was outdated.

Ali provided the remaining two letters in 2007, soon after he relocated to the cubicle, and those letters were equally unhelpful.   One was undated and simply explained Ali's "multiple allergies" were "persistent and recurrent" and that he should "limit his exposure to these allergens by being in an isolated office environment (private room)."  (Pls. Ex. B4).  The final letter, dated April 13, 2007, explained that Ali's allergies were "persistent and recurrent, possibly due to continued exposure to environmental allergens."  (Pls. Ex. B3) (emphasis added). Therefore, "[i]t may be advisable for him to limit his exposure to these allergens by being in an isolated office environment."  (*Id*.) (emphasis added).

None of the supplemental letters provide any more information than Ali had previously supplied, and the last letter was so equivocal that its value was minimal.

The undisputed facts and the record here require that the court reject Ali's argument that the Agency was to blame for the break-down in the interactive process.  Therefore, the court will grant the Agency summary judgment on Ali's reasonable accommodation claim.


### 3.  Disparate Treatment & Retaliation

The court having granted the Agency's motion to dismiss Ali's reasonable accommodation claim, the only remaining disability related claims are for: (1) disparate

treatment; and (2) retaliation.  Ali points to nothing in the record that would support

either of those claims, however.

The court raises a possible disparate treatment claim, because while Ali does not

specifically allege such a claim in his Complaint, he claims in his brief that the Agency

"provided accommodation" to a younger Caucasian female "because she wanted more sunlight

coming into her cubicle" in the SHP Division.  (Compl. p. 7; Pls. Br. pp. 29-30).

This factual allegation, standing alone, is insufficient to make out a claim for disparate

treatment.

> Perhaps the most common way that employees [in disparate treatment cases]
> demonstrate pretext is by showing that similarly situated employees of a different
> [protected class] were treated more favorably. Such comparisons, however, will
> only give rise to an inference of discrimination if all of the relevant aspects of their
> employment situation are "nearly identical."

*Robertson v. Dodaro*, 767 F. Supp. 2d 185, 195 (D.D.C. 2011) (alterations and some quotations

omitted) (emphasis added) (citing *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 495 (D.C.

Cir. 2008)).

Ali's unsupported allegation does not meet this standard.  He has not alleged any

facts or produced any evidence that his situation was "nearly identical" to the purported

comparator.  For example, there is nothing in the record that might indicate whether the

Agency provided the alleged accommodation to the young woman under the AWS or the

Rehabilitation Act.  Ali does not indicate whether the young woman's accommodation

involved making an exception to a division policy—such as the policy that only

supervisors receive private offices.  Ali does not allege or point to evidence that the

young woman had – like Ali – provided insufficient medical documentation of her

disability.  More importantly, Ali alleges that the Agency provided the woman with more

light in her "cubicle" as an accommodation.  (Pls. Br. pp. 29–30).  If the Agency

provided her with an accommodation "in her cubicle," she was not similarly situated to

Ali, who requested a private office as an accommodation.  Thus, this unidentified young

woman is not an appropriate comparator, and Ali's mention of her in his brief does not

give rise to a viable disparate treatment claim.

Ali's comparison of himself to employees outside of the SHP Division is

similarly deficient.  (*See* Pls. Br. p. 7; Compl. p. 9).  He alleges that the Agency refused

to give him a private office, even though it allowed non-supervisory employees in the EA

Division to occupy private offices.  (Pls. Br. p. 7).  He also alleges that outside his

division, the larger OST had private offices available.  (Pls. Br. p. 19).

These arguments are unpersuasive because Ali implicitly admits that he was

treated the same as other similarly situated employees inside the division where he

worked: "[T]o my knowledge none of the non-supervisory employees at GS-13 or lower

in the [division] has an office; all of them sit in cubicles."  (Defs. Ex. 1, p. 54, Ali.

11/16/07 EEO Aff.).  Thus, Ali's claim that there were private offices available outside of

his division does not support a disparate  treatment claim because Ali has not established

that he was entitled to a private office as an accommodation under the Rehabilitation Act.

Therefore, the Agency had no obligation to try and secure a private office for him outside

of his division, and the availability of private offices in other divisions is irrelevant

without comparator evidence, of which there is none.   Moreover, Ali has failed to direct

the court to any evidence of disparate treatment associated with his move from a private

office to a cubicle, and therefore, the court will grant the Agency's motion for summary judgment with regard to a disability related disparate treatment claim.[14]

Ali claims that the Agency's request for additional medical information was retaliatory, but the court finds that this claim is not viable. To establish a *prima facie* case for retaliation, a plaintiff must show, *inter alia*, that "there was a causal connection between the protected activity and the adverse employment action." *Duncan v. Washington Metro. Area Transit Auth.*, 214 F.R.D. 43, 50 (D.D.C. 2003) (*citing McDonnell Douglas*, 411 U.S. at 802; *McGill v. Munoz*, 203 F.3d 843, 845 (D.C. Cir. 2000)). Ali engaged in protected activity for the first time in the late 1990s when he filed his first claim against the Agency, claiming disparate treatment in promotions. The seven-year gap between his prior lawsuit and the alleged retaliation here in 2007, is, without more, insufficient to establish causation. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 274 (2001) ("[Adverse a]ction taken (as here) 20 months later suggests, by itself, no causality at all.").

Ali next engaged in protected activity on April 18, 2007, when he contacted an EEO counselor approximately one month after his move to a cubicle. It is undisputed, however, that Haig requested additional medical information from Ali the year <u>before</u> Ali contacted the EEO counselor. Thus, Haig's request could not have been retaliatory.

## IV. CONCLUSION

For the reasons set forth above, the court finds that there are no genuine disputed

---

[14] Additionally, the court notes that there is no evidence that the Agency treated anyone who was younger, of a different race, or female more favorably with respect to application of the AWS program.

issues of material fact and the Agency is entitled to judgment as a matter of law.


Date:  April 12, 2016


*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge